UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* [SEALED], | ) ) ) | Civil Action No. _____ |
| | ) | RELATORS' ***SEALED*** COMPLAINT |
| Plaintiffs/Relators, | ) | PURSUANT TO THE FALSE CLAIMS ACT, |
| vs. | ) | 31 U.S.C. §3729, *ET SEQ.* |
| | ) | |
| [SEALED], | ) | **FILED UNDER SEAL** |
| | ) | **DO NOT PLACE ON PACER** |
| Defendants. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| | ) | |

**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | Civil Action No. _____ |
| DOROTHY GRIFFIN and TERESA LONG, | ) | |
| | ) | RELATORS' **<u>SEALED</u>** COMPLAINT |
| Plaintiffs/Relators, | ) | PURSUANT TO THE FALSE CLAIMS ACT, |
| vs. | ) | 31 U.S.C. §3729, *ET SEQ.* |
| | ) | |
| LIVINGSTON REGIONAL HOSPITAL, LLC | ) | <u>**FILED UNDER SEAL**</u> |
| and LIFEPOINT HEALTH, INC., | ) | <u>**DO NOT PLACE ON PACER**</u> |
| | ) | |
| Defendants. | ) | <u>**DEMAND FOR JURY TRIAL**</u> |
| | ) | |
| | ) | |

## <u>RELATORS' COMPLAINT PURSUANT TO THE</u>
## <u>FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.*</u>

On behalf of the United States of America, Plaintiffs-Relators Dorothy Griffin and Teresa Long ("Relators") bring this *qui tam* complaint against Livingston Regional Hospital, LLC ("Livingston Regional") and LifePoint Health, Inc. ("LifePoint") (collectively "Defendants") for violations of the federal False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq.*, to recover all damages, civil penalties and other recoveries provided for under that statute. Relators also bring this action on behalf of themselves against Defendants for retaliation and constructive termination of Relators' employment in retaliation for their efforts to stop Defendants' fraud against the United States, in violation of 31 U.S.C. §3730(h).

## I.   <u>THE PARTIES</u>

1.      Defendant Livingston Regional is a Delaware limited liability company with a principal address of 330 Seven Springs Way, Brentwood, Tennessee 37027.  The company's primary business is the ownership and operation of Livingston Regional Hospital ("Livingston

1

Regional Hospital" or the "Hospital"), a 114-bed hospital located in Livingston, Overton County, Tennessee. Included within the Hospital is a ten-bed inpatient geriatric psychiatric unit called the OakPoint Program ("OakPoint") which is at the center of Relators' allegations in this case.

2.      Defendant LifePoint is a publicly-traded, Delaware corporation headquartered at 330 Seven Springs Way, Brentwood, Tennessee 37027.  LifePoint owns and operates dozens of hospitals, spread over 21 different states, and is the parent corporation of Livingston Regional.

3.      Plaintiff-Relator Dorothy Griffin ("Ms. Griffin" or "Relator Griffin") is an adult resident of New Albany, Kentucky.  Ms. Griffin is a registered psychiatric nurse and worked as the charge nurse for OakPoint for approximately two years, until her employment ended in August of 2016.

4.      Plaintiff-Relator Teresa Long ("Ms. Long" or "Relator Long") is an adult resident of Cookeville, Tennessee.  Ms. Long is a licensed social worker, holding a master's of social work degree ("MSW"), and worked as a social worker at Livingston Regional Hospital— including within OakPoint—from May 24, 2015, until her employment ended in September of 2016.

5.      Relators have standing to bring this action pursuant to 31 U.S.C. §3730(b). Relators' complaint is not based on any other prior disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

6.      Relators are disclosing all of the material evidence and information underlying their allegations to the United States, pursuant to 31 U.S.C. §3730(b)(2).

2

7. The United States is a plaintiff to this action. The United States, through the Relators, brings this action on behalf of the United States Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and other federally funded health care programs, including Medicare.

## II. <u>SUMMARY OF THE ACTION</u>

8. Defendants have defrauded the United States by knowingly billing for inpatient psychiatric care that they never actually provided to patients. Specifically, Defendants knowingly and consistently failed to provide "active" psychiatric treatment to their patients, despite the fact that active treatment is a requirement for federal reimbursement of inpatient psychiatric treatment.

9. In many cases, Defendants admitted patients into OakPoint who could not benefit from active treatment in the first place. Such patients included late-stage dementia and Alzheimer's patients with limited situational awareness, as well as patients with untreated urinary tract infections ("UTIs") and other physical ailments that caused behavioral changes, which could have and should have been treated medically, rather than through inpatient psychiatric treatment.

10. Relators saw these patients come into OakPoint on a regular basis, and regularly asked their supervisors why such patients were on census—without ever receiving satisfactory answers.

11. Section VI.A of this complaint, paragraphs 79 through 90, provides eight representative examples of patients who OakPoint should never have admitted for treatment. These eight representative patients were Medicare beneficiaries, and one or both of the two Relators interacted personally with all eight of them.

3

12.     Defendants also failed to provide individualized plans of treatment for their patients—despite the fact that individualized treatment plans are an absolute requirement for inpatient psychiatric billing.

13.     Defendants also failed to meet minimum staffing requirements set by CMS for inpatient psychiatric facilities and created false and misleading documents in order to cover up this fact.

14.      Finally, during much of the time that Relators worked at OakPoint, the facility's psychiatrist, Dr. Christopher Dull ("Dr. Dull"), deliberately extended the stay of patients beyond what was medically necessary, resulting in significant overbilling to Medicare. This practice was often detrimental to the patients' well-being, as they would be discharged in worse physical condition than when they were admitted (*e.g*., no longer ambulatory or developing illnesses) due to their lengthy and unnecessary stays in an acute setting.

15.     Relators raised their concerns about these practices through LifePoint's corporate compliance hotline and HHS Office of the Inspector General's ("OIG") fraud hotline, in May and June of 2016.  The reports to LifePoint did spark an internal investigation, but Livingston Regional Hospital continued to improperly admit patients into OakPoint and continued to fail to provide appropriate "active" psychiatric treatment to patients.

16.     Additionally, as a direct result of their internal reporting, Relators were each harassed, bullied, and retaliated against by their supervisors at Livingston Regional Hospital, making their continued employment untenable.

## III.     <u>JURISDICTION AND VENUE</u>

17.     Jurisdiction is founded upon the FCA, 31 U.S.C. §3729 *et seq.*, specifically 31 U.S.C. §3732(a)-(b), and also 28 U.S.C. §§1331, 1345.

4

18. Venue in the Middle District of Tennessee is appropriate under 31 U.S.C. §3732(a) in that, at all times material to this civil action, Defendant transacted business in the Middle District of Tennessee and submitted and caused the submission of false claims in the Middle District of Tennessee.

19. Relators are providing the United States with a full disclosure of substantially all material facts, as required by the FCA, 31 U.S.C. §3730(b)(2).

## IV. GOVERNING LAWS AND REGULATIONS

### A. IFP PPS Billing by Psychiatric Facilities

20. Under Medicare Part A ("Part A"), facility payments to hospitals and other inpatient treatment centers are generally made under the prospective payment system set forth at 42 C.F.R. §412.1(a)(1), *et seq*.

21. However, inpatient psychiatric facilities, such as OakPoint, can exclude themselves from this system and bill under a separate per diem system specifically for inpatient psychiatric care—known as the Inpatient Psychiatric Facility ("IPF") Prospective Payment System ("PPS"). *See* 42 C.F.R. §§412.25, 412.27. The logic behind having a separate PPS system for psychiatric facilities is that those facilities typically must provide more care and oversight for their patients than is typical for acute-care general hospitals. As a result, the IPF PPS is designed to provide higher reimbursement to the psychiatric facilities than they would receive under Part A's standard facility fee payments to hospitals.

22. Under this system, certified inpatient psychiatric facilities—which can be stand-alone psychiatric hospitals, or distinct psychiatric units within a larger hospital—receive compensation at a set rate for each day that a particular patient is treated. That rate is calculated based on a variety of factors—including the location of the facility, the age of the patient, and

5

patient co-morbidities. *See* MEDICARE CLAIMS PROCESSING MANUAL, *Chapter 3 – Inpatient Hospital Billing* §190 (Aug. 2016). While the precise per diem formula is complicated, the general rule is that rural facilities with older, sicker patients (*i.e.*, patients with multiple co-morbidities) will receive higher rates of reimbursement per day than urban facilities with younger, healthier patients.

23. Payment under the IPF PPS also varies somewhat over the length of a patient's stay, with the facility receiving upward adjustments for the first several days of the patient's stay, with small but steady decreases in per diem payments over time. *See id.* §190.5.5.

**B.      Requirements that facilities must meet in order to bill under the IPF PPS**

24. Billing under the IPF PPS system can be incredibly lucrative for a psychiatric facility. However, not all psychiatric facilities are eligible to bill under that system. In order to qualify for IPF PPS billing—as compared to the default facility payments for a hospital under Medicare Part A—facilities must meet a number of stringent criteria imposed by CMS.

25. First, and perhaps most importantly, an IPF must establish that it really is a specialized, psychiatric facility. To qualify, the facility must only admit patients "whose admission to the unit is required for active treatment, of an intensity that can be provided appropriately only in an inpatient hospital setting." 42 C.F.R. §412.27(a).

26. CMS has emphasized that "active treatment" in an IPF is necessarily different from the "skilled care" provided by general hospitals. Specifically, CMS has emphasized that in order for services at an IPF to qualify as "active treatment," such services must be: (1) provided under an individualized treatment or diagnostic plan; (2) reasonably expected to improve the patient's condition or for the purpose of diagnosis; and (3) supervised and evaluated by a

physician. MEDICARE BENEFIT POLICY MANUAL, *Chapter 2 – Inpatient Psychiatric Hospital Services* §§30.2.2-30.2.2.1 (May 2016).

27.     Second, an IPF must satisfy CMS-mandated staffing requirements, to ensure that patients are truly receiving the active psychological treatment for which the facility is billing. These staffing requirements include a requirement that the IPF employ a director of inpatient psychiatric services; a director of psychiatric nursing services; and a director of social services. 42 C.F.R. §412.27(d)(1)-(5).   At a more general level, the IPF is required to have "adequate numbers of qualified professional and supportive staff to evaluate inpatients, formulate written, individualized comprehensive treatment plans, provide active treatment measures and engage in discharge planning."  42 C.F.R. §412.27(d).

### C.      The False Claims Act

28.     The FCA provides, in part, that any entity that: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties.   31 U.S.C. §3729(a)(1)(A)-(B). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.  31 U.S.C. §3729(a)(1)(G).

29.     A person acts "knowingly" under the FCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."   31

U.S.C. §3729(b)(1)(A)(i)-(iii). No proof of specific intent to defraud is required by the FCA. 31 U.S.C. §3729(b)(1)(B).

30.     FCA violations may result in civil monetary penalties for every false claim submitted, plus three times the amount of damages sustained by the government as a result of the defendants' illegal conduct. 31 U.S.C. §3729(a)(1).

## V.     FACTUAL BACKGROUND – THE OAKPOINT PROGAM AND RELATORS' JOB RESPONSIBILITIES

31.     At all times relevant to this complaint, OakPoint has operated as a 10-bed inpatient geriatric psychiatric facility contained within Livingston Regional Hospital, in Livingston, Tennessee.

32.     The vast majority of OakPoint's patients are Medicare beneficiaries.

33.     Up until mid-2015, OakPoint was managed by a company called Horizon, which specialized in running exactly this type of facility. However, at some point in 2015, Horizon withdrew from the Hospital and the Hospital took direct control over the day-to-day management of OakPoint.

34.     As part of this transition, OakPoint hired a new psychiatrist, Dr. Dull, and also appointed a new program director, registered nurse ("RN") Tami Jo Branham, who had previously served as OakPoint's nurse manager.

35.     Dr. Dull lived in Nashville at the time and retained an active practice in the Nashville area, so he only made it to OakPoint once or twice each week. As a result, Nurse Branham had primary authority over the day-to-day operations of the facility, including decisions regarding patient care.

8

36.    In November of 2015, OakPoint terminated its relationship with Dr. Dull and hired Dr. Viswa Durvasula ("Dr. Durvasula") as its psychiatrist.  As of the date of filing this complaint, Dr. Durvasula remains the sole psychiatrist at OakPoint.

37.    Relator Griffin worked as a psychiatric nurse at OakPoint beginning in mid-2014. In that role, Relator Griffin evaluated patients for purposes of admission, worked to develop treatment and discharge plans, and regularly checked on patients in the unit to identify and treat changes in physical and psychiatric status.  During this period, Relator Griffin reported directly to Nurse Branham, and ultimately to the chief nursing officer ("CNO") for the Hospital, Colleen Tuck.  In her role as OakPoint charge nurse, Relator Griffin gained an in-depth, personal knowledge of the policies and practices at the facility.

38.    Relator Long began working as a social worker at Livingston Regional Hospital in May of 2015. However, when she began her job, she did not see patients at OakPoint.  In or around November of 2015, Relator Long, together with another social worker named Susan Fortner ("Ms. Fortner"), was transferred to OakPoint.  In her role as an OakPoint social worker, Relator Long developed a detailed knowledge of the policies and practices at the facility.

## VI.    DEFENDANTS' SCHEMES TO DEFRAUD THE UNITED STATES

39.    CMS permits inpatient psychiatric facilities to bill under the IPF PPS based on the presumption that those facilities are providing active psychiatric treatment, of an intensity that cannot be performed in a less restrictive setting.

40.    OakPoint has knowingly and unlawfully taken advantage of this system, billing Medicare for active psychiatric treatment, without actually providing such treatment to its patients.

9

41.     First, OakPoint regularly admitted patients who did not need, or were incapable of benefitting from active psychiatric treatment. Such patients included late-stage dementia and Alzheimer's patients, as well as patients with mental changes caused by physical, rather than psychological conditions. For example, OakPoint regularly admitted patients with urinary tract infections ("UTIs")—a condition that can cause significant neurological problems, especially in patients with dementia or Alzheimer's. The administration of antibiotics, rather than admission to a psychiatric facility, was the proper course of action for such patients.

42.     Second, OakPoint has consistently failed to actually provide active treatment to its patients. The facility has failed to meet CMS staffing requirements, failed to establish individualized plans of treatment, and has generally operated more like a skilled nursing facility than an inpatient psychiatric unit.

43.     Third, during the time that Dr. Dull was the psychiatrist for OakPoint, he deliberately kept patients longer than was medically necessary to maintain the census with as little work for him as possible. Because Dr. Dull lived in Nashville and only went out to OakPoint once or twice per week, it was far easier for Dr. Dull to retain patients for longer periods of time than it was to actually evaluate and treat a higher number of patients with higher turnover rates. While Relators only worked with Dr. Dull at OakPoint, they have learned from other LifePoint employees that Dr. Dull engaged in the same basic scheme in at least one other LifePoint facility—the inpatient psychiatric facility at Sumner Regional Medical Center ("Sumner Regional"), in Gallatin, Tennessee.

44.     Through this scheme, OakPoint has submitted false and fraudulent claims for hundreds of patients—often at per diem rates of hundreds or even thousands of dollars per day—

10

for services that Defendants knew did not constitute "active treatment" and that were therefore not properly payable by Medicare.

**A.  OakPoint Knowingly and Regularly Admitted Patients Who Could Not Benefit From Active Psychiatric Treatment**

45.  One of the basic requirements that CMS imposes on psychiatric facilities billing under the IPF PPS is that those facilities "[a]dmit only patients whose admission to the unit is required for active treatment, of an intensity that can be provided appropriately only in an inpatient hospital setting." 42 C.F.R. §412.27(a).

46.  Defendants, through their admission practices, have knowingly and repeatedly violated this requirement.

**1.  Defendants Regularly Admitted Late-Stage Dementia and Alzheimer's Patients Who Could Not Possibly Benefit From Active Treatment**

47.  Under CMS regulations, a diagnosis of Alzheimer's or dementia does not automatically foreclose the *possibility* of active inpatient treatment. MEDICARE BENEFIT POLICY MANUAL, *Chapter 2 – Inpatient Psychiatric Hospital Services*, § 30.2.2.1 (May 2016). However, CMS has also emphasized that such treatment can *only* be considered "active" if it can be "[r]easonably expected to improve the patient's condition." *Id.* Patients with advanced Alzheimer's or late-stage dementia typically fall outside this definition, as they lack the mental acuity or situational awareness to actively engage in or benefit from their own psychiatric treatment.

48.  Despite these clear regulations, OakPoint regularly admitted late-stage dementia and Alzheimer's patients who could not and did not benefit from inpatient psychiatric treatment.

49.  Many of these patients came from area nursing homes, and a significant number also came in as internal referrals from other units of Livingston Regional Hospital. OakPoint

11

also received referrals from individuals looking after elderly relatives and seeking short-term respite care.

50.    OakPoint was supposed to serve as a gatekeeper for all of these potential referrals and make sure that the only patients who were admitted were those with genuine need for active psychiatric treatment on an inpatient basis.  Accordingly, OakPoint had detailed policies on how to pre-screen potential patients, to ensure that those patients were actually suitable for admission. In practice, however, OakPoint often disregarded these policies in order to fill beds.

51.    Under its own pre-screening policies, OakPoint was required to obtain and record, among other information, a medical and psychiatric history of the patient, the patient's current mental status and presenting behavioral issues, and also current labs for the patient.

52.    Prior to admission, OakPoint was also supposed to conduct an assessment of the patient and administer several cognitive and psychosocial examinations to determine the patient's mental acuity and ability to benefit from inpatient therapy.  Such tests typically included the Mini Mental State Exam ("MMSE"), which measures mental acuity, a geriatric depression scale exam, and a suicide risk assessment.

53.    The ultimate purpose of this assessment was to ensure that patients met CMS' criteria for inpatient psychiatric treatment—*i.e.* a Diagnsotic and Statistical Manual of Mental Disorders IV diagnosis of sufficient severity with reasonable expectation that inpatient treatment would improve the patient's condition.

54.    OakPoint also promulgated exclusion criteria—*i.e.* criteria for when patients should not be admitted—including "[p]atients with a substantiated diagnosis of dementia with no acute behavioral change or no known psychiatric disorder and no expectation for a positive

12

response to treatment," as well as "[p]atients who are bedfast or who cannot participate in the treatment program due to physical limitations."

55.     While these policies existed on paper, the reality is that OakPoint rarely followed them, and regularly and knowingly admitted late-stage dementia and Alzheimer's patients who could not reasonably benefit from inpatient psychiatric treatment.

56.     As a psychiatric nurse, Relator Griffin often completed the inquiry forms for potential referrals and administered pre-admission tests such as the MMSE.  As often as not, this information strongly indicated that the potential patient was not a good candidate for admission, and Relator Griffin would relay that information to the program director, Nurse Branham.

57.     Time and again, however, Nurse Branham would brush aside these concerns and admit patients over Relator Griffin's objections.

58.     On other occasions, the nursing staff would not even be involved in filling out the relevant patient inquiry forms.  Instead, that role would be handled by OakPoint's full-time marketer, Ms. Vickie Bilbrey ("Ms. Bilbrey").  This created obvious conflicts, not only because Ms. Bilbrey had no medical training, but also because a major part of her job was to seek out patient referrals from area nursing homes. Given Ms. Bilbrey's strong desire to remain in the good graces of these nursing homes in order to continue getting more referrals, Ms. Bilbrey did not really consider whether the patient being referred was actually a good candidate for inpatient treatment.  Instead she focused on how to get these referrals processed and approved for OakPoint admission.

59.     Throughout the period that the Relators worked there, OakPoint's overriding goal was to keep beds full, even when that meant accepting significant numbers of patients who could not reasonably be expected to benefit from inpatient psychiatric treatment.

### 2. OakPoint Regularly Admitted Patients Who Had Not Been Medically Cleared

60. During this period, OakPoint also regularly admitted patients who had not been medically cleared, despite the fact that these admissions defied OakPoint's own written policies and CMS rules stating that inpatient psychiatric treatment is only proper in circumstances where less intensive treatment has been tried, or is unlikely to be effective.

61. Medical clearance is a critical component of any pre-admission screening, as behavioral changes in a patient can result just as frequently from medical conditions as they can from psychiatric conditions, and active psychiatric treatment is completely unnecessary if the root cause of a patient's problem is not psychiatric to begin with.

62. One common example of a medical condition causing behavioral changes in geriatric patients is urinary tract infections (UTIs). In older patients, UTIs often lead to increased confusion, agitation, and/or withdrawal. In patients with Alzheimer's or dementia, such symptoms can be even more pronounced, and may also include hallucinations and delusions.

63. In most cases, UTIs can be treated with a simple course of antibiotics, and once the infection is gone, the behavioral symptoms will also dissipate.

64. Accordingly, psychiatric facilities must take care in performing their pre-admission screenings to make sure that the patient actually has a psychiatric condition, rather than a medical one. CMS will not pay psychiatric facilities to treat medical conditions that could be treated just as effectively—and far less expensively—in a general hospital or even an outpatient facility.

65. OakPoint, however, regularly ignored this obligation. Relator Griffin regularly observed patients being admitted to the facility before OakPoint had received results of any urine

14

or blood testing, making it impossible to rule out possible medical causes for the patient's behavioral changes.

66.     Relator Griffin also observed numerous occasions when OakPoint would admit a patient even *after* blood tests and/or urinalysis came back positive for some underlying physical condition, such as a UTI.

67.     In fact, when Relator Griffin raised her concerns about this issue with her supervisors, those supervisors, including Nurse Branham, the program director, specifically told her that it was fine to admit patients into the unit who had UTIs.

68.     Another problem at OakPoint was that neurological assessments—which were supposed to be completed by the medical doctor on call—were regularly not performed.

69.     The purpose of a neurological assessment was to ensure that the patient's brain was physically functioning—*e.g*., that synapses were firing properly—in order to rule out brain trauma or other physical injury as the cause of the patient's behavioral change.  Ruling these potential causes out was important because inpatient psychiatric treatment has little to no value for a patient with a condition such as a traumatic brain injury, and it would not be proper to admit such a patient to the facility.

70.     Dr. Mason, one of the two medical doctors at Livingston Regional Hospital on rotation for OakPoint, routinely failed to perform these neurological exams within 24 hours of admission, as required.

71.     Nurse Branham was aware of this issue and responded by dating the neurological assessment forms herself and then leaving those forms for Dr. Mason to sign.  In many cases, it was not clear to Relators whether Dr. Mason even performed these assessments, or whether he simply signed off on them.

15

72.     As a result of these failures to medically clear patients, OakPoint knowingly and regularly admitted patients who had no need for psychiatric treatment—and who accordingly could not benefit from it—and whose health, in at least some cases, actually declined because of the improper psychiatric treatment that OakPoint provided.

### 3.     Hospital Management Pressured OakPoint to Accept Medically Inappropriate Patients

73.     Part of the reason for these improper patient admissions is that hospital management, including hospital Chief Executive Officer ("CEO") Tim McGill, set internal admission targets for OakPoint and pressured the program director to meet or exceed these targets every month.

74.     Hospital management checked up on OakPoint's progress at hospital "volume" meetings, which were held once or twice each week.

75.     As the program director, Nurse Branham attended these meetings on behalf of OakPoint during most of the period that Relators worked at the facility.  During this period, Relators did not know that there were admission targets for OakPoint, as Nurse Branham never shared that fact with them.

76.     For a brief period in June and July of 2016—after Nurse Branham had been placed on administrative leave and Relators had been named interim directors for OakPoint—Relators attended these meetings themselves, which is how they learned about the admission targets.

77.      CEO McGill noted during several of these meetings that OakPoint and the Hospital's rehabilitation unit were the two primary moneymakers for the Hospital, and that all of the other unit directors needed to be on the lookout for potential patient referrals for OakPoint.

16

78.     No one ever explained to Relators how the admission targets for OakPoint were calculated.

### 4.     Specific Examples of Improper Patient Admissions

79.     Based on their own first-hand experience treating patients at OakPoint, Relators are aware of the following patients who were improperly admitted to OakPoint for treatment, and whose care was improperly billed to Medicare.

80.     Patient A,[1] an 82-year-old man and Medicare beneficiary, was admitted to OakPoint on May 28, 2015.  Patient A had late-stage dementia and was not able to pass his MMSE.  He was only marginally verbal and had swallowing problems that grew progressively worse during his time at the facility, requiring speech therapy and eventually intubation.  Relator Griffin asked Dr. Dull and Nurse Branham multiple times why this patient was on census, as he was not able to participate in therapy in any meaningful way, but she never received a satisfactory response.  Patient A remained on census until June 30, 2015, a medically unnecessary stay of 34 days. Patient A was discharged into hospice and died approximately two weeks later.

81.     Patient B, an 84-year-old woman and Medicare beneficiary, was admitted to OakPoint on October 12, 2015, from Pickett Care and Rehabilitation Center nursing home. Patient B was admitted despite the fact that she presented with an untreated UTI, based on a diagnosis of dementia with aggressive behavior.  Initially, OakPoint began treating her UTI with antibiotics, which seemed effective in reducing her combativeness.  However, when Dr. Dull wrote his psychiatric evaluation for Patient B, he did so without ever laying eyes on her,

---

[1]     Throughout this complaint, Relators identify specific patients by letter—*e.g*., Patient A—rather than by name, in order to protect patient privacy.  Relators are providing the names of these patients to the United States and can provide additional identifying information if and when necessary.

improperly and mistakenly basing his evaluation off of a psycho-social evaluation that had previously been prepared for an entirely different OakPoint patient, with a similar name. Based on that improper evaluation, Dr. Dull prescribed Patient B Risperidone, a powerful antipsychotic used primarily to treat bipolar disorder and schizophrenia. At that point, Patient B's condition deteriorated. Patient B was discharged back to Pickett Care and Rehabilitation Center on October 19, 2015, a medically unnecessary stay of eight days.

82. Patient C, an 89-year-old man and Medicare beneficiary, was admitted to OakPoint on October 23, 2015, with an admitting condition of pneumonia—which, notably, is not even a psychiatric diagnosis. Patient C remained at OakPoint until November 9, 2015, a medically unnecessary stay of 18 days.

83. Patient D, a 76-year-old man and Medicare beneficiary, was admitted to OakPoint on December 31, 2015, with a diagnosis of "dementia delusions behavioral disturbance." Patient D had late-stage dementia, could not feed himself, and was bedbound. Patient D was only marginally verbal and could not actively participate in any therapy at OakPoint. Patient D remained on census at OakPoint until January 13, 2016, a medically unnecessary stay of 14 days.

84. Patient E, a 91-year-old woman and Medicare beneficiary, was admitted to OakPoint from the Overton County Health and Rehabilitation Center on December 1, 2015, ostensibly for "major depression disorder." Patient E had advanced dementia, and although she could moan and yell out, she was not capable of any meaningful verbal expression and accordingly could not meaningfully participate in any therapy. She was also not capable of feeding herself. Patient E remained on census at OakPoint until December 17, 2015, a medically unnecessary stay of 17 days. Patient E was subsequently readmitted to OakPoint on March 7,

18

2016, with a similar diagnosis, and remained at the facility until April 8, 2016, a medically unnecessary stay of over 30 days.

85.     Patient F, an 86-year-old man and Medicare beneficiary, was admitted to OakPoint on July 21, 2015, for "dementia with behavioral dyscontrol." Patient F was disoriented and not able to participate in therapy. Patient F remained on census at OakPoint until August 7, 2015, a medically unnecessary stay of 15 days. Patient F was subsequently readmitted to OakPoint on March 9, 2016, and remained on census until March 24, 2016, a medically unnecessary stay of 15 days.

86.     Patient G, an 88-year-old woman and Medicare beneficiary, was admitted to OakPoint on June 2, 2015, for "dementia with disturbance of behavior." Patient G was disoriented, required a one-person assist to get out of bed, and was not able to take part in her own therapy. Patient G remained on census until June 25, 2015, a medically unnecessary stay of 23 days.

87.     Patient H, a 77-year-old woman and Medicare beneficiary, was admitted to OakPoint on September 9, 2015, from Pickett Care and Rehabilitation Center, for "dementia delusion behavioral dyscontrol." Patient H was disoriented when she entered the facility, and her disorientation got progressively worse during the time she was there. Patient H was not able to take part in her therapy in any meaningful way. Patient H remained on census at OakPoint until September 23, 2015, a medically unnecessary stay of 14 days. Patient H was subsequently readmitted to OakPoint from Pickett Care and Rehabilitation Center on March 7, 2016, and remained until April 7, 2016, a medically unnecessary stay of 31 days.

19

88.     These patients are representative of the broader trend at OakPoint to prioritize filling beds over its legal obligation to accept only those patients who could actually benefit from active inpatient care.

89.     OakPoint knowingly and regularly admitted late stage dementia and Alzheimer's patients, as well as patients with medical, rather than psychiatric conditions, and fraudulently billed Medicare for their care under the IPF PPS billing system.

90.     While Relators cannot precisely quantify how many improper patients OakPoint admitted during the period that Relators worked there, Relators believe that such patients accounted for approximately half of the patient census at any given time.

**B.     OakPoint Failed to Provide Active Treatment to its Patients**

91.     In addition to deliberately violating its legal obligations with respect to admitting patients, OakPoint also failed to provide active treatment to *any* of its patients, rendering the care that OakPoint provided completely ineligible for reimbursement under the IPF PPS.

92.     Pursuant to federal regulations, active treatment is a prerequisite for payment under the IPF PPS, 42 C.F.R §412.27, and active treatment necessarily requires: (1) an individualized treatment plan; and (2) specified minimum levels of professional staffing and oversight.

93.     OakPoint systematically failed to provide such individualized treatment plans, and also systematically failed to meet the staffing requirements mandated by CMS.  As a result, all claims that OakPoint submitted for IPF PPS were false and fraudulent.

**1.** **Patient Treatment Plans Were Delayed, not Individualized, and Sometimes not Completed Until Patient Discharge**

**a.** **Treatment Plans Were Not Individualized**

94. Under CMS rules and regulations, an individualized plan of patient care is an absolute prerequisite for a psychiatric inpatient facility to bill under the IPF PPS. *See*, *e.g.*, MEDICARE BENEFIT POLICY MANUAL, *Chapter 2 – Inpatient Psychiatric Hospital Services* §30.3.1 (May 2016) ("Each patient must have an individual comprehensive treatment plan that must be based on an inventory of the patient's strengths and disabilities.").

95. This written plan, which must be completed within 72 hours of patient admission, must contain: (a) a substantiated diagnosis; (b) short-term and long-range goals; (c) the specific treatment modalities utilized; (d) the responsibilities of each member of the treatment team; and (e) adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out. *Id*.

96. At OakPoint, however, these requirements were almost never observed.

97. One basic problem was that very few of the treatment plans were actually individualized.

98. During the period that Horizon managed the facility, it provided the staff with a training manual that contained a number of cheat sheets the staff used to quickly fill out their respective portions of a patient's treatment plan—particularly those portions addressing short and long term goals. OakPoint continued using these Horizon cheat sheets well after Horizon stopped managing the facility in 2015.

99. While there is nothing inherently wrong with a health care provider using model language in crafting a treatment plan, providers at OakPoint relied upon this stock language to an

unreasonable degree, often copying language into patient plans that had no connection to the actual patient in question.

100.     For example, Relators Griffin and Long both saw patients suffering from late-stage dementia or Alzheimer's with a short term treatment goal listed as "attend at least three group sessions daily and verbalize at least one positive coping skill during group sessions"—or something to that effect.  Such goals would be listed in the treatment plans despite the fact that the patient in question had no cognitive ability to gain or retain the knowledge needed to verbalize such coping skills in a training session.

101.     This reliance on cheat sheets and model language also resulted in OakPoint's treatment plans failing to address significant mental and physical health problems in their patients.  Patient A, for example, discussed in the prior section of this complaint, was suffering from pneumonia at the time he was admitted.  However, his treatment plan failed to even acknowledge pneumonia as a condition that OakPoint would have to address in treating him, because the providers who filled out Patient A's chart relied almost entirely on stock language.

**b.     Treatment Plans Were Significantly Delayed**

102.     In addition to not being truly individualized, treatment plans at OakPoint were not completed in a timely manner—and in some cases were not actually completed or signed at all until the patient was discharged.

103.     This problem was particularly acute from about March of 2015 until November of 2015, when Dr. Dull was the psychiatrist for the facility.

104.     During the time that Dr. Dull served as OakPoint's psychiatrist, he lived in Nashville—approximately 100 miles from OakPoint—and maintained an active private practice in the Nashville area while also serving as a psychiatrist at Sumner Regional.  As a result, Dr.

Dull typically came into OakPoint no more than twice a week, and sometimes only once per week.

105.    Because he was so rarely at the facility, Dr. Dull almost never completed his patient evaluations on time, despite the fact that Medicare mandates that such evaluations be completed within 60 hours of patient admission.  42 C.F.R. §482.61(b)(1).  This delay, in turn, meant that treatment plans were rarely completed in a timely manner, as the psychiatric evaluations had to be complete before any reasonable treatment plan could be developed.

106.    Another source of delay was the fact that treatment plans required collaboration between the different members of a patient's treatment team.  However, treatment team meetings at OakPoint only took place once a week, typically on Tuesday mornings.  As a result, a patient admitted on Tuesday afternoon might go a full week at OakPoint without her treatment team actually meeting to discuss her treatment plan. Often, social worker Mechelle Beaty was tasked with completing the treatment plans on behalf of **all** disciplines and then those plans were later signed by the respective discipline with little or no meaningful review.

107.    This problem was not limited to the period of time when Dr. Dull was the psychiatrist for OakPoint.  The once-weekly team meeting policy had been instituted and insisted upon by Nurse Branham, and the policy continued even after Dr. Durvasula became OakPoint's psychiatrist on staff.

108.    Finally, Relators know that for all patients admitted after mid-April of 2016, the treatment plans prepared by OakPoint were completely deficient.  OakPoint fired its activities therapist, who had been responsible for completing those portions of patient treatment plans dealing with recreational and activity therapy, in or around April of 2016.  No replacement was

23

hired, and no other staff members took over the responsibility for completing those portions of the treatment plans.

### c. An Internal Audit in January of 2016 Confirmed that OakPoint Was Failing to Establish Individualized Treatment Plans

109. Sometime in or around January of 2016, internal auditors from Highpoint Health System performed an audit of OakPoint's charting practices. This audit was part of Livingston Regional Hospital's broader effort to prepare its different units and departments for a state survey later in the year.

110. Although neither Relator was directly involved in this audit, one of the auditors shared her findings with Relator Long, in order to notify Relator Long of significant failures in OakPoint's record keeping practices.

111. Specifically, these audit findings identified the following areas—among others— as being areas where OakPoint needed improvement:

- "Need 1:1 therapy sessions and be tailored to the patient's needs";

- "Psych evals must be completed w/in 72 hrs";

- "Activities need to be more individualized for each patient";

- "Must address medical issues for the patients during their stay";

- "If a patient is identified as a fall risk, this must be on their treatment plans"; and

- "Be specific with the treatment plans. Example: adaptive details, be more descriptive."

112. These audit findings clearly demonstrated that OakPoint was failing in its basic obligation to provide timely, individualized treatment plans for its patients.

113.     Relators do not know who within OakPoint received copies of the final audit results, if anyone.   However, from their own fist-hand experiences, Relators know that these underlying issues with patient treatment plans continued well past January of 2016.

### 2.     OakPoint Failed to Meet its CMS Staffing Obligations

114.     As noted above, OakPoint tried to increase its profitability by keeping its beds full, even when that meant admitting medically inappropriate patients.

115.     At the same time, OakPoint also tried to minimize its expenses by keeping its staffing levels as low as possible.

116.     The problem with this practice is that CMS has established express staffing requirements that a facility such as OakPoint must meet in order to bill the United States under the IPF PPS.   The facilty must have "adequate numbers of qualified professional and supportive staff to evaluate patients, formulate written, individualized comprehensive treatment plans, provide active treatment measures, and engage in discharge planning."   42 C.F.R. §482.62. OakPoint consistently failed to meet this requirement.

### a.     Because He Was So Rarely Present, Dr. Dull Failed to Actually Monitor and Evaluate the Treatment Being Provided at OakPoint

117.     First, and perhaps most importantly, from the period between in or about March through November of 2015, OakPoint never had a psychiatrist present for more than two days per week.

118.     While CMS does not mandate any specific number of hours that a psychiatrist must be present at an inpatient psychiatric facility, CMS does require there to be sufficient coverage from psychiatrists to "monitor and evaluate the quality and appropriateness of services

Case 2:16-cv-00095   Document 1   Filed 11/04/16   Page 26 of 49 PageID #: 26

and treatment provided by the medical staff." 42 C.F.R. §482.62(b)(2). This never happened while Dr. Dull was clinical director for OakPoint.

119.    Because he was so rarely present, Dr. Dull was constantly playing catch up, leaving the actual oversight of the facility to Nurse Branham. Moreover, Dr. Dull rarely completed patient psychiatric evaluations within 60 hours, as mandated by CMS, and would often fill out his evaluations without any meaningful patient interaction, and based on records that other medical staff at the facility had completed.

120.    Relator Griffin is aware of at least one specific example—which is set forth above with respect to Patient B—where Dr. Dull's failure to provide meaningful oversight or evaluation directly endangered a patient's health. Dr. Dull prescribed Patient B Risperidone, a powerful antipsychotic used primarily to treat bipolar disorder and schizophrenia, based on information that Dr. Dull had taken from the charts of a different patient whom he had confused for Patient B. Dr. Dull prescribed this drug without having actually laid eyes on Patient B or performing a true psychiatric evaluation.

> **b.    OakPoint Failed to Meet its Obligation to Employ a Director of Social Services**

121.    Another specific staffing requirement imposed by CMS on inpatient psychiatric facilities is the requirement to employ a "director of social services who monitors and evaluates the quality and appropriateness of social services furnished." 42 C.F.R. §482.62(f).

122.    Relator Long has direct, first-hand knowledge that OakPoint failed in this obligation. First, up until November of 2015, the only social worker actually working at OakPoint held only a bachelor's degree in social work. Second, after November of 2015, OakPoint formally designated Relator Long as the Director of Social Work—without ever telling

Relator Long, and despite the fact that Relator long worked part-time and was only at OakPoint every other week.

### i.     Through November of 2015

123.     When Relator Long started at Livingston Regional Hospital in May of 2015, she worked on the general side of the Hospital (*i.e.* not at OakPoint) on a part-time basis.  She and another part-time social worker, Ms. Fortner, alternated weeks at the Hospital.

124.     During this same period, social worker Mechelle Beaty, who held only a bachelor's degree in social work, was OakPoint's only social worker.

125.     Under CMS regulations, "at least one staff member" at an IPF must hold a master's degree in social work.  42 C.F.R. §482.62(f).

126.     Because Ms. Beaty did not have a master's degree in social work degree, the Director of Case Management for the Hospital, Mary Ann Stockton, required that Relator Long and Ms. Fortner sign off on all of Ms. Beaty's charts, even though neither Relator Long nor Ms. Fortner was given the opportunity to independently see OakPoint patients in order to truly confirm the accuracy of those notes.

127.     During this period, Ms. Beaty performed all of the social work assessments for OakPoint—assessments which were used to formulate individual treatment plans.  Relator Long and Ms. Fortner were required to sign off on these assessments, even though they were not tasked with performing or in any way overseeing them.

### ii.     From November of 2015 Forward

128.     At some point in or around November of 2015, the managers of OakPoint, including Nurse Branham, realized that because Ms. Beaty held only a bachelor's degree in social work, OakPoint did not satisfy CMS staffing requirements.

129.     Accordingly, Ms. Beaty was transferred to work at the general side of the Hospital, and Relator Long and Ms. Fortner began working primarily at OakPoint—still on a part-time, alternating week schedule.

130.     In or around April of 2016, Relator Long discovered that OakPoint had revised its Patient Handbook—at least as early as March of that year—listing Relator Long as the "Director of Social Work" for the unit.

131.     Relator Long was surprised by this discovery, as no one at Livingston Regional Hospital had ever communicated to her that she was going to be the Director of Social Work, nor had anyone provided any information to her regarding any oversight or management responsibilities.

132.     That same Patient Handbook listed Relator Long's colleague, Ms. Fortner, as the "Primary Therapist" for the unit.

133.     Relator Long found it surprising that OakPoint would choose to list part-time employees as both Director of Social Work and Primary Therapist for the facility, given that she and Ms. Fortner were each entirely absent from OakPoint every other week.

134.     Moreover, given that Relator Long and Ms. Fortner—the only two social workers at OakPoint after November of 2015—never worked the same weeks, there was really no one for Relator Long to direct or oversee in her role as "Director."

135.     Relator Long raised this issue during an OakPoint staff meeting in May of 2016, which was attended by Hospital CNO Collen Tuck.  In response to Relator Long's concerns, CNO Tuck told her, dismissively, "I can assure you, you are not the director."  That statement, in turn, prompted an immediate protest from Nurse Branham, also in attendance, that she had to have someone designated as the Director of Social Work.  CNO Tuck and Nurse Branham

28

quickly dropped the issue, but neither of them ever addressed Relator Long's concerns that she was being designated as Director of Social Work without having been informed of that fact, without receiving any instructions on what she had to do in that role, and without even having a full-time position on the OakPoint staff.

136.     It was clear to Relator Long from that meeting that the "directorship" was a sham, and that Nurse Branham, in revising the Patient Handbook, had used Ms. Long's name so that OakPoint would appear to be in compliance with federal law, instead of actually hiring enough qualified social workers to be in compliance.

137.     Despite Relator Long's stated concerns, OakPoint continued to list her as the Director of Social Work during the period of time she was working there, and to list Ms. Fortner as Primary Therapist.

> ### c.     Beginning in or Around April of 2016, OakPoint Failed to Meet Its Staffing Requirements with Respect to Therapeutic Activities; Leading to Fraudulent Records Being Kept of Therapy Being Completed

138.     In or around April of 2016, CNO Tuck informed the staff at OakPoint that the position of therapeutic activities director was being eliminated, as it was no longer necessary— despite the fact that it was the activities director who had been responsible for leading group therapy and documenting group therapy goals in patient treatment plans.

139.     After the therapeutic activities director was let go, CNO Tuck and OakPoint program director Nurse Branham instructed the clinical nursing assistants ("CNAs") on the unit to take responsibility for group therapy and activities.

140.     In reality, this proved impossible.     The CNAs were not trained in group psychiatric therapy, nor did they have time to actually lead such therapy or therapeutic activities, given their other responsibilities within the facility.

29

141.    As a result, from approximately late March of 2016 onward, group therapy and group activities were rarely, if ever, performed at OakPoint.

142.    In order to cover up this fact, Nurse Branham asked the CNAs and nurses on the unit to fabricate notes for group therapy that was never actually conducted, and also to categorize as group therapy activities that clearly were not group therapy. Nurse Branham falsified many of these treatment charts herself.

143.    For example, Relator Griffin knows that on May 25, 2016, Nurse Branham charted 50 minutes of group music therapy during a period of time that Relator Griffin knows Nurse Branham to have been in a meeting. Nurse Branham was counting music playing on the television in the day room as group music therapy.

144.    From March of 2015 until at least early June, such fabrication of group treatment records became the norm at OakPoint.

> **d.     OakPoint Made Staffing Decisions Based On a Rigid Staffing Matrix That Did Not Adequately Reflect Patient Needs**

145.    On a more general level, OakPoint regularly failed to provide "adequate numbers of qualified professional and supportive staff to evaluate patients, formulate written, individualized comprehensive treatment plans, provide active treatment measures, and engage in discharge planning." 42 C.F.R. §482.62.

146.    Based on OakPoint's staffing matrix, there was only ever one RN and one licensed practical nurse ("LPN") at the facility, regardless of the patient census or particular patient needs.

147.    On weekends, the staffing matrix did not provide for any coverage by social workers, nurse managers, case managers or activities therapists.

148.    Additionally, during periods when the patient census happened to drop, the activities therapist would be told not to come in, leaving no therapeutic activities support for patients at the facility.  Nurse technician and case manager coverage also dropped to zero when the patient census fell.

### 3.    OakPoint Regularly Left Patients Restrained for Significant Periods of Time Without Any Active Treatment

149.    Given the generally low staffing levels and significant number of patients suffering from advanced Alzheimer's and dementia, it was common practice for OakPoint to simply place patients in special geriatric chairs ("gerichairs") for much of the day.  These chairs were built with a tray that, once locked in place, could not be unlocked by the person sitting in the chair, effectively restraining that person.

150.    As a practical matter, an average day for many patients at OakPoint consisted of little more than being assisted out of bed, propped up in a gerichair, wheeled into the day room, and placed in front of the television.

151.    While such restraint may be appropriate for certain late-stage Alzheimer's and dementia patients, to ensure that they do not fall or otherwise harm themselves, it does not constitute active treatment.

152.    Indeed, at many times, OakPoint functioned far more as a respite care nursing center than it did a true inpatient psychiatric facility.

153.    When Dr. Durvasula replaced Dr. Dull as psychiatrist for the facility, she actually pushed back on what she saw as the overuse of gerichairs for OakPoint patients.  However, Nurse Branham, who held the real decision-making power over day-to-day operations, ignored Dr. Durvasula's concerns, because patients restrained in gerichairs were far easier to manage.

31

154.     Patients A and D, are two examples of patients who were routinely propped into gerichairs and left in the day room for much of each day.

155.     Another example, Patient I, a 72-year-old man with late-stage dementia and a Medicare beneficiary, was admitted to OakPoint on December 11, 2015.  Patient I was chair-bound and incapable of meaningful participation in any therapy.

156.     To make matters worse, Patient I was improperly subjected to seclusion in December of 2015, when he became combative, without sufficient follow up supervision by OakPoint.  Specifically, Nurse Branham did not ensure that regular face-to-face evaluations of Patient I's status were conducted every four hours—despite the fact that this was official OakPoint policy.

157.     Nurse Branham later created a back-dated seclusion log, falsely stating that Relator Griffin had performed face-to-face evaluations.  Nurse Branham asked Relator Griffin to sign that form so that Nurse Branham could place it in the patient's records.

158.     When Relator Griffin refused, Nurse Branham forged Relator Griffin's signature on the form and placed the form in Patient I's file anyway.

159.     While Patient I represents an extreme case, the broader policy of restraining patients was commonplace, and was further evidence that most of these patients were not receiving active treatment, and in many cases were not capable of participating in active treatment even if offered.

160.     On May 20, 2016, Dr. Kenneth Beaty ("Dr. Beaty"), a Livingston Regional Hospital medical doctor, spoke up at a Hospital utilization management committee meeting, stating that he had received consistently negative reports from patients whom he had referred

32

into OakPoint. Dr. Beaty noted that his patients had reported that they were left for long stretches of time each day sitting in the day room with no real staff interaction.

161.    Dr. Beaty also stated at that meeting that he believed OakPoint was failing to provide active psychiatric treatment to a significant number of its patients, and that he would not be referring any of his patients to OakPoint going forward.

162.    Just a few days later, on May 25, 2016, Nurse Branham sent an email to all of the nurses at OakPoint, telling them to make sure to notify Dr. Beaty any time one of his patients was admitted into or discharged from OakPoint.

C.    **Dr. Dull Knowingly and Regularly Delayed Patient Discharge for Reasons Having Nothing to do with Medical Necessity**

1.    **At OakPoint**

163.    Beginning in about March of 2015, when Dr. Dull took over as the psychiatrist for OakPoint, the average length of stay for patients dramatically increased.

164.    Relators took note of this, and Relator Griffin asked Dr. Dull in or about May of 2015, why so many patients were being kept far longer than seemed necessary.

165.    Shockingly, Dr. Dull acknowledged that the primary reason to keep patients longer was because Medicare would continue to pay for their treatment, with only small reductions in per diem rates for longer patient stays.

166.    From the perspective of OakPoint and the Hospital management, a filled bed was a filled bed. While Hospital management preferred higher patient turnover, as that helped with OakPoint's monthly admission numbers, the ultimate priority was keeping the census up.

167.    For Dr. Dull, who only made it out to OakPoint one or two days per week, having a smaller number of patients for longer periods of time was far easier to manage, as it required him to perform fewer patient certifications, fewer initial evaluations, and the like.

33

168.     Given that so many patients at OakPoint had late-stage dementia or Alzheimer's anyway—and were unlikely to complain about being kept longer than was appropriate—it was often very easy to certify and recertify these patients for lengthy inpatient stays.

169.     In other instances, Dr. Dull deliberately prescribed arbitrarily low doses of anti-psychotic and anti-depressant drugs, in order to draw out the amount of time it would take for those drugs to become effective—thus extending patient stays.

170.     One drug that Dr. Dull commonly prescribed in odd doses was the anti-psychotic Zyprexa.  While the drug is commonly prescribed in increments of 5 or 10 milligrams, Dr. Dull would often prescribe dosages that did not track these common dosage forms—*i.e.* 8 milligrams rather than 10 milligrams.

171.     Relator Griffin often received phone calls from irritated Hospital pharmacists, noting how difficult such dosages were to prepare, and in some instances telling Relator Griffin that she would have to cut up pills herself in order to achieve Dr. Dull's desired dosage.

172.     When Relator Griffin questioned Dr. Dull about this practice, he again responded that that there was nothing to worry about, because there were only slight reductions in per diem payments for keeping patients longer.  He never addressed whether these strange doses were actually appropriate for any of the patients for whom they were being prescribed.

173.     OakPoint's own trend report data further corroborates that Dr. Dull was keeping patients longer than necessary in order to secure more Medicare payment, and to make his own life easier.

174.     From the beginning of 2009 until Dr. Dull took over as psychiatrist, OakPoint had never had a month when the average length of patient stay was more than 20 days.  In fact, other than one outlier month in February of 2012, when the average length of patient stay was 17.94

34

days, OakPoint had never had a month where the average length of stay was more than 16 days. Most months during this period, the average length of stay was between 12 and 14 days.

175.     During the period when Dr. Dull was psychiatrist, however, there were three months when the average length of stay was over 20 days.  In June of 2015, the average length of stay was 22.14 days; in August of 2015 it was 20.79 days; and in September of 2015 it was 25.2 days.  Additionally, there were two months during this period when the average length of stay was higher than 16 days—July and October of 2015.

176.     OakPoint cannot credibly argue that these extended patient stays were due to anything other than Dr. Dull's preference for keeping patients longer to make his job easier, particularly given that the average length of stay dropped back down to the normal range for OakPoint patients almost as soon as Dr. Dull was replaced by Dr. Durvasula.

177.     Relators are also aware that it was predominantly traditional Medicare patients— *i.e.,* Part A patients—who were subjected to these deliberately prolonged stays.  Patients with private insurance, as well as those with Medicare Advantage plans managed by private insurance carriers, were not, because those insurance plans often required preapproval for treatment, including preapproval for the patient's projected length of stay.  As a result, OakPoint subjected Medicare beneficiaries to longer stays than similarly situated private insurance or Medicare Advantage patients.

178.     Given that Medicare pays hundreds of dollars per day for inpatient psychiatric treatment—sometimes thousands of dollars per day depending on patient age, comorbidities, etc. –every day that Dr. Dull kept patients at the facility who did not need to be there, he, as the OakPoint psychiatrist, was knowingly and directly causing false and fraudulent claims to be submitted to Medicare.

35

## 2. At LifePoint Health's Inpatient Psychiatric Facility at Sumner Regional Medical Center

179.    Dr. Dull's unlawful practice of keeping patients on census longer than medically necessary was not limited to OakPoint. At a minimum, he appears to have engaged in the exact same practices at LifePoint Health's IPF at Sumner Regional Medical Center in Gallatin, Tennessee.

180.    Sumner Regional and Livingston Regional are both part of the Highpoint Health System—a system that also includes two smaller, critical access hospitals: Riverview Regional Medical Center, and Trousdale Medical Center. All four hospitals, as well as the broader Highpoint Health System are part LifePoint's hospital network.

181.    During the period that Dr. Dull served as the psychiatrist for OakPoint, he also served as a psychiatrist for Sumner Regional, which has a 12-bed inpatient psychiatric facility similar to the one at OakPoint, referred to as the "Restorative Care Unit."

182.    It is Relators' understanding that Dr. Dull left Sumner Regional in or around March or April of 2016.

183.    In or around January of 2016 Relator Long reached out to Erin, a social worker at Sumner Regional, in an effort to learn about what social service practices and procedures Sumner Regional's Restorative Care Unit had in place that OakPoint did not.

184.    One topic they discussed was that both Relator Long and Erin had seen a notable increase in the length of patient stays under Dr. Dull.

185.    Accordingly, Dr. Dull's practice of keeping Medicare beneficiaries in inpatient psychiatric care longer that medically necessary extended to at least one other LifePoint facility.

## VII. RELATORS REPORT FRAUD, LEADING TO BOTH AN INTERNAL INVESTIGATION AND RETALIATION

### A. Relators Report Fraud and are Made Temporary OakPoint Directors

186.    In May of 2016, after raising their concerns informally for months, Relators decided to formally report the fraudulent conduct taking place at OakPoint.

187.    In early May of 2016, both Relator Griffin and Relator Long called the HHS OIG fraud hotline—specifically emphasizing OakPoint's failure to develop individualized treatment plans, its backdating of critical patient records, and that group therapy was not being done.

188.    Approximately three weeks later, on or about June 1, 2016, Relators each called Defendant LifePoint's corporate compliance hotline.

189.    On or about June 3, 2016, LifePoint corporate compliance officers visited OakPoint and began pulling files and reviewing records.  The following week, outside attorneys representing LifePoint separately interviewed both Relator Long and Relator Griffin—making it clear that LifePoint and top management for the Hospital were aware that Relator Long and Relator Griffin had been the ones to submit the hotline complaints.

190.    In its review, LifePoint found enough troubling evidence that on or about June 8, 2016, LifePoint placed Nurse Branham on administrative leave.

191.    The same day, Livingston Regional Hospital CEO McGill and HR Director Cindy Smale, met with Relator Long and, separately with Relator Griffin, and asked each of them to serve as interim directors for OakPoint—Relator Long as the "Interim Program Director" and Relator Griffin as the "Interim Nursing Director."  Relator Long and Relator Griffin both accepted.

192.    Shortly thereafter, the Hospital also brought in a consultant, named Brian Bair, from LifePoint corporate to assist in the reorganization of the unit.

37

### B. Defendants Retaliate Against Relators

193.    From the moment Relator Griffin and Relator Long stepped into their roles as interim directors of OakPoint, Defendants went out of their way harass and retaliate against them.

194.    For one, as soon as Relator Long stepped into her co-director position, the Hospital pulled Ms. Fortner from OakPoint and reassigned her to work on the non-OakPoint side of the Hospital—without providing Relator Long with any advance notice.

195.    This put Relator Long in the untenable position of having to serve simultaneously as the only social worker on OakPoint and as OakPoint's co-interim director during the middle of a LifePoint investigation.

196.    Relator Long repeatedly told Hospital administrators—including CEO McGill— that OakPoint needed more social work support.  Initially, Relator Long was just ignored.  Later, CEO McGill told her that she could hire a 30 day temporary social worker, which is almost impossible to do in practice, as there are very few qualified social workers interested in such a position.  As a result, Relator Long never received the social work support she needed.

197.    Additionally, during this period, both Relator Long and Relator Griffin were deliberately excluded from meetings regarding OakPoint, despite the fact that the Hospital had asked them to step into the directorship roles.  For example, when a patient alleged potential abuse by an OakPoint staff member in a satisfaction survey, CNO Tuck and Hospital CEO McGill refused to allow Relators to have any role in the Hospital's follow up meetings discussing those complaints.

198.    Relators were also locked out of Nurse Branham's office and not provided with any alternative work space within OakPoint.

199.    Also during this period, Relator Long learned that the Hospital had begun actively searching for her replacement as a social worker—even though the Interim Program Director job at OakPoint was, by its very nature, temporary, and Relator Long assumed that she would be able to return to her previous job when the interim director role ended.

200.    On or about July 11, 2016, Defendants removed Relator Griffin from her position as Interim Nursing Director, and returned her to her role as a charge nurse for OakPoint. However, she was informed that she was being put on a new schedule, where she would have to work every other weekend.

201.    Prior to accepting the Interim Nursing Director position, Relator Griffin had always worked the same rotation.  After being put back into her role as charge nurse, she found herself having to work more weekends than any other nurse on the unit.

202.    Relator Griffin called LifePoint corporate compliance and raised her concern that that this sudden removal from the interim nursing position and new schedule were retaliation for her initial call to corporate compliance in May.

203.    In response, Relator Griffin's schedule was briefly changed back to what it had been. However, Relator Griffin's supervisors specifically told her that this change was only temporary and that she would have to go back to working regular weekends starting in September.

204.    Due to family obligations, this new schedule was untenable for Relator Griffin. She ultimately determined that she had no choice to submit her notice of resignation, which she did on August 10, 2016.

205.    Meanwhile, Relator Long felt compelled to resign her position as Interim Program Director at OakPoint at about the same time that Relator Griffin was removed from her position

as Interim Nursing Director, hoping that she would be able to resume her job as a *pro re nata* ("PRN") social worker before Defendants hired a replacement and there was no job to go back to.

206.    Relator Long talked to Social Work Director Nancy Hill about her concerns, and Ms. Hill specifically told Relator Long that she would be the first priority for the position if Relator Long wanted the job back.  Ms. Hill also told Relator Long that she should write an email to the Hospital HR Department specifically explaining that Relator Long intended to move back into her prior role.

207.    In the interim, CEO McGill told Relator Long she could return to her position as a PRN social worker, but she and Ms. Fortner would now be responsible for providing all social work services in the Hospital—despite the fact that Relator Long and Ms. Fortner had previously only been responsible for OakPoint.

208.    Defendants then posted a formal job listing, seeking a "director of social work" for OakPoint, and LifePoint consultant Brian Bair encouraged Relator Long to submit a formal application.

209.    Relator Long stated to Mr. Bair that she had real concerns that CEO McGill was trying to force her out of the Hospital and that he would not take her application seriously.

210.    Soon thereafter, Relator Long and Mr. Bair met with CEO McGill. Mr. Bair formally recommended Ms. Long for the director of social work position.  In response, CEO McGill stated that he was preparing to back Horizon back to manage OakPoint—as it had done up until the spring of 2015—and that he wanted Horizon to be part of all staffing decisions.

211.    Relator Long submitted her application, but never received an interview.

40

212.     Soon after, Relator Long saw that the position had been switched from a Hospital position to a Horizon position, so she submitted her application to Horizon as well. She spoke with the new interim director for OakPoint that Horizon had brought in, Alan Eskenazi, and Mr. Eskenazi told her he thought she would be great for the job and that he would put in a good word for her.

213.     However, Relator Long never received so much as an interview for the position.

214.     Relator Long also noticed that Horizon's job listing had changed the minimum qualifications for the job to include being a licensed clinical social worker (LCSW)—which was not a qualification Relator Long held. The timing of this change was suspicious to Relator Long, as OakPoint had never required any of its social workers to be LCSWs, and during the period that OakPoint held Relator Long out as their Director of Social Work, they had never raised any issue about her not having an LCSW.

215.     Relator Long knows that Hospital HR Director, Cindy Smale, spoke up on her behalf—and on behalf of Relator Griffin—and conveyed to the LifePoint Ethics and Compliance Department that the Hospital's management appeared to be retaliating against the two of them. Defendants did nothing in response.

216.     Due to this open hostility displayed by her supervisors, remaining at Livingston Regional Hospital became untenable for Relator Long. Relator Long felt no real choice but to submit her resignation, which she did in late September of 2016.

217.     Notably, very soon after Relator Long resigned, Horizon changed back the minimum qualification requirement for the director of social work position from LCSW to MSW—the degree Relator Long held.

218. In short, after Defendants learned that Relators had raised their fraud concerns to LifePoint's compliance office, Defendants went out of their way to isolate Relators, gave them new oversight positions while simultaneously making it impossible for them to succeed in those positions, and then made it impossible for Relators to resume their prior positions. These actions were clearly retaliatory and ultimately amounted to the constructive discharge of Relators' employment.

## VIII.  CAUSES OF ACTION

### COUNT I
### Violation of the Federal False Claims Act – 31 U.S.C. § 3729(a)(1)(A)-(B)

219. Relators reallege and incorporate by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

220. This is a claim by Relators, on behalf of the United States of America, for treble damages and penalties under the FCA, 31 U.S.C. §§3729-3733, against Defendants for knowingly causing to be presented false or fraudulent claims for payment or approval, and/or for making, using, or causing to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States government.

221. Specifically, Defendants have submitted false and fraudulent claims for inpatient psychiatric treatment, pursuant to CMS' IPF PPS, when Defendants knew that Defendants' OakPoint facility was not providing such treatment, was accepting patients who could not possibly benefit from such treatment, and keeping patients longer than medically necessary.

222. In addition, Defendants repeatedly made false records material to false or fraudulent claims paid by the United States, in the form of unlawfully backdated patient evaluations, neurological assessments, and treatment plans.

42

223.    By virtue of these false and fraudulent claims that Defendants presented, the United States has suffered actual damages.

224.    Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants subject to any adjustment in the range of appropriate penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

## COUNT II
### Violation of the Federal False Claims Act - 31 U.S.C. §3729(a)(1)(G)

225.    Relators reallege and incorporate by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

226.    To the extent that of the claims that Defendants submitted for psychiatric services under the IPF PPS were not knowingly false and fraudulent at the time they were submitted for payment, Defendants still violated the FCA for knowingly retaining and concealing overpayments made by the United States for services that Defendants later discovered were not eligible for Medicare reimbursement.

227.    By virtue of Defendants' knowing concealment and avoidance of their obligations to pay money to the United States, the United States suffered damages.

228.    Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants subject to any adjustment in the range of appropriate penalties mandated by the Federal Civil Penalties Inflation

Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

**COUNT III**

**Retaliation against Plaintiff-Relator Griffin – 31 U.S.C. § 3730(h)**

229.    Relators reallege and incorporate by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

230.    Defendants have a duty under the under the FCA to refrain from taking any retaliatory actions against employees for attempts to report or stop fraud, pursuant to 31 U.S.C. §3730(h).

231.    Relator Griffin engaged in protected conduct by reporting on OakPoint's fraudulent billing practices to Defendant LifePoint's corporate compliance hotline, as well as to HHS OIG's fraud and abuse hotline.

232.    Defendants were clearly aware that Relator Griffin engaged in this protected conduct, as her report led to a highly visible internal investigation at OakPoint, in which Relator Griffin was interviewed at length.

233.    In violation of 31 U.S.C. §3730(h), Defendants retaliated against Relator Griffin's efforts to stop OakPoint's fraud against the United States—including, without limitation, by demoting her from her interim director position and then immediately assigning her to a new and undesirable work schedule that Relator Griffin could not really work in light of her outside family obligations, ultimately requiring her to resign from OakPoint.

234.    Defendants' retaliation and constructive termination of Relator Griffin's employment damaged Relator Griffin, in an amount to be determined at trial.

44

235.     Pursuant to 31 U.S.C. §3730(h), Relator Griffin is entitled to her actual damages, to liquidated damages equal to her actual damages, and to her litigation costs, including reasonable attorneys' fees incurred in pursuit of her retaliation claims.

## COUNT IV

### Retaliation against Plaintiff-Relator Long – 31 U.S.C. § 3730(h)

236.     Relators reallege and incorporate by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

237.     Defendants have a duty under the under the FCA to refrain from taking any retaliatory actions against employees for attempts to report or stop fraud, pursuant to 31 U.S.C. §3730(h).

238.     Relator Long engaged in protected conduct by reporting on OakPoint's fraudulent billing practices to Defendant LifePoint's corporate compliance hotline.

239.     Defendants were clearly aware that Relator Long engaged in this protected conduct, as her report led to a highly visible internal investigation at OakPoint, in which Relator Long was interviewed at length.

240.     In violation of 31 U.S.C. §3730(h), Defendants retaliated against Relator Long's efforts to stop OakPoint's fraud against the United States—including, without limitation, by offering her a temporary director position, advertising for a new social worker to replace her while she was working in that interim director position, and refusing to consider her application for her old job after she resigned from the interim director position.

241.     Defendants' retaliation and constructive termination of Relator Long's employment damaged Relator Long, in an amount to be determined at trial.

242.    Pursuant to 31 U.S.C. §3730(h), Relator Long is entitled to her actual damages, to liquidated damages equal to her actual damages, and to her litigation costs, including reasonable attorneys' fees incurred in pursuit of her retaliation claims.

## PRAYER FOR RELIEF

Relators respectfully request that this Court enter judgment against Defendants as follows:

A.    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this complaint, as the FCA provides at 31 U.S.C. § 3729 *et seq.;*

B.    That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States, subject to any adjustment in the maximum allowable penalty mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

C.    That pre- and post-judgment interest be awarded;

D.    That the Court grant permanent injunctive relief to prevent any recurrence of violations of the FCA;

E.    That Relator Griffin receive all compensation she is entitled to under 31 U.S.C. §3730(h) for Defendants' retaliatory actions, including actual damages, liquidated damages, compensatory damages, and reasonable litigation costs, including reasonable attorneys' fees incurred in pursuit of her retaliation claims;

F.    That Relator Long receive all compensation she is entitled to under 31 U.S.C. §3730(h) for Defendants' retaliatory actions, including actual damages, liquidated damages, compensatory damages, and reasonable litigation costs, including reasonable attorneys' fees incurred in pursuit of her retaliation claims;

G.      That Relators be awarded the maximum percentage of any recovery allowed to them pursuant to the FCA;

H       That Relators be awarded all costs and expenses of this action, including statutory attorneys' fees, expenses and costs as permitted by FCA;

I.      That this Court award such other and further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged.


DATED: November 4, 2016                    Respectfully Submitted,


                                           JERRY E. MARTIN

                                           BARRETT JOHNSON MARTIN
                                             & GARRISON, LLC
                                           JERRY E. MARTIN (TBR #20193)
                                           SETH M. HYATT (TBR #31171)
                                           Bank of America Plaza
                                           414 Union Street, Suite 900
                                           Nashville, TN 37219
                                           Telephone: 615/244-2202
                                           615/252-3798 (fax)
                                           jmartin@barrettjohnston.com
                                           shyatt@barrettjohnston.com

                                           GILBERT RUSSELL McWHERTER SCOTT
                                             & BOBBITT, PLC
                                           JONATHAN BOBBITT (TBR # 23515)
                                           341 Cool Springs Boulevard, Suite 230
                                           Franklin, TN 37067
                                           Telephone: 615/354-1144
                                           731/664-1541 (fax)
                                           jbobbitt@gilbertfirm.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JONAH H. GOLDSTEIN*
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
MATTHEW S. MELAMED*
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
mmelamed@rgrdlaw.com

*motions for admission *pro hac vice* forthcoming


Attorneys for Plaintiffs/Relators